**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
ROCCO DELUCA and MARGARET
DELUCA,

                     Plaintiffs,

            -against-

PORTLAND ORTHOPAEDICS LIMITED, an
Australian company; PLUS ORTHOPEDICS, a
California corporation; MAXX HEALTH, INC.,
a Pennsylvania corporation; MAXX
ORTHOPEDICS, INC, a Pennsylvania
corporation; and MIPRO US, INC., a
Pennsylvania corporation,

                     Defendants.
----------------------------------------------------------X

**MEMORANDUM OF
DECISION & ORDER**
2:15-cv-05562 (ADS)(AKT)

**APPEARANCES:**

**Houssiere Durant & Houssiere, LLP**
*Counsel for the Plaintiffs*
1990 Post Oak Blvd, Suite 800
Houston, TX 77056
      By:    Monica C. Vaughan, Esq., Of Counsel

**Peters Berger Koshel & Goldberg, P.C.**
*Counsel for the Plaintiffs*
26 Court Street, Suite 2803
Brooklyn, NY 11242
      By:    Richard L. Goldberg, Esq., Of Counsel

**Hinshaw & Culbertson LLP**
*Counsel for the Defendants*
28 State Street, 24th Floor
Boston, MA 02109
      By:    Geoffrey M. Coan, Esq.,
             Jamie Kessler, Esq.,
             Kristen G. Niven, Esq., Of Counsel

**SPATT, District Judge**:

On September 25, 2015, Plaintiffs Rocco Deluca ("Rocco") and Margaret Deluca ("Margaret") (together, the "Delucas" or "Plaintiffs") initiated this action against the Defendants Portland Orthopaedics Limited ("Portland"), Plus Orthopedics ("Plus"), Maxx Orthopedics, Inc., ("Maxx Ortho"), Maxx Health, Inc. ("Maxx Health"), Mipro US, Inc. ("Mipro US") (together, the "Defendants"). The complaint alleges numerous claims that arise out of the alleged failure of a hip replacement device, the M-Cor Modular Hip System ("M-Cor"), which was surgically implanted into Rocco. *See* Docket Entry ("DE") 1. The complaint asserts five causes of action: (1) strict products liability – failure to warn; (2) strict products liability – manufacturing defect; (3) strict products liability – design defect; (4) negligence; and (5) breach of implied warranty. *Id*. Portland and Plus both failed to appear in this action and as a result, the action against Portland was dismissed on May 12, 2016. Defendants' Rule 56.1 Statement and Plaintiffs' Counter-Statement of Undisputed Material Facts ("SOF") ¶ 6.

Presently before the Court is a motion for summary judgment filed by Maxx Health, Maxx Ortho and Mipro US (together, the "Moving Defendants") pursuant to Federal Rule of Civil Procedure ("FED. R. CIV. P." or "Rule") 56, seeking summary judgment.

For the reasons set forth herein, the Moving Defendants' motion for summary judgment is granted in part and denied in part.

## I. BACKGROUND

### A. THE FACTUAL BACKGROUND

On January 5, 2009, Rocco, a New York resident, received an M-Cor implant during hip replacement surgery at Plainview Hospital in Plainview, New York. SOF ¶ 2. X-rays confirmed

that Rocco's M-Cor implant failed on September 26, 2012. *Id*. ¶ 3. As a result, Rocco required incidental medical treatment, which occurred in New York. *Id*. ¶ 4.

Portland, an Australian company that has not appeared in this action, designed and manufactured M-Cor. *Id*. ¶ 7. The company went into voluntary administration on December 2, 2008 and entered into receivership on or about December 5, 2008. *Id*. ¶ 8. Public auctions conducted by the trustees and receivers of Portland resulted in an Asset Sale and Purchase Agreement (the "Agreement") with Mipro Ortho Pte. Ltd., the Singaporean parent of Mipro US, on March 27, 2009. The Agreement included the purchase of the M-Cor product line as well as the intellectual property, inventory, equipment and design documents regarding that product. *Id*. ¶¶ 11-12. The Agreement specifically excluded the sale of other product lines, Portland's goodwill, cash, accounts receivable, insurance policies, tax documents, minute books. The agreement provided that the buyer: "shall not assume and shall not be liable for all of the debts, contracts, commitments, obligations and other Liabilities of any nature whatsoever of [Portland] and [its] direct and indirect subsidiaries, whether known or unknown, accrued or not accrued, fixes or contingent…" *Id*. ¶¶ 13-14.

On March 26, 2009, Mipro US and Maxx Health incorporated in the State of Pennsylvania. *Id*. ¶ 10. On April 13, 2009, Mipro US and Mipro Ortho Pte. Ltd. entered into a subsidiary agreement in which Mipro US began manufacturing the M-Cor product line in the United States. The subsidiary agreement states that "Mipro US will be responsible for procuring inventory, components and other supplies and for manufacturing, testing, assembling and delivering the [M-Cor] to its customers." *Id*. ¶¶ 46-48.

On April 7, 2009, Mipro US and Maxx Health entered into a distributor sales agreement. That same day, Mipro US also entered into a consulting agreement with Maxx Ortho. Neither

Maxx Health nor Maxx Ortho is a parent or subsidiary of any other Defendant nor have they ever acquired assets or liabilities from Portland. Further, neither company has ever manufactured the M-Cor product line. *See id.* ¶¶ 27-43.

## II. DISCUSSION

### A. STANDARD OF REVIEW: FED. R. CIV. P. 56

Pursuant to Rule 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015); *Kwong v. Bloomberg*, 723 F.3d 160, 164-65 (2d Cir. 2013); *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

It is the movant's burden to initially demonstrate the absence of material facts that preclude summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005) (citing *Castro v. United States*, 34 F.3d 106, 112 (2d Cir. 1994)). Such a "burden on the moving party may be discharged by 'showing' … that there is an absence of evidence to support the nonmoving party's case." *PepsiCo, Inc. v. CocaCola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986)). If the moving party meets the initial burden, the nonmoving party must present specific facts that demonstrate there is a genuine issue that should be left for the fact-finder to decide. *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002); *see also Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (requiring the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts … the nonmoving

party must come forward with 'specific facts showing that there is a genuine issue for trial.'" (internal citations omitted)). Mere conjecture, speculation, or conclusory statements are not enough to defeat summary judgment. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (internal citations omitted). The "mere existence of a scintilla of evidence" is insufficient to defeat summary judgment. *Anderson*, 477 U.S. at 252.

In considering a summary judgment motion pursuant to Rule 56, the Court must "view the evidence in the light most favorable to the non-moving party … and may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal citations omitted); *see also Doro v. Sheet Metal Workers' Int'l Ass'n*, 498 F.3d 152, 155 (2d Cir. 2007) (noting that in deciding a summary judgment motion, the court will "constru[e] the evidence in the light most favorable to the nonmoving party and draw[] all inferences and resolv[e] all ambiguities in favor of the nonmoving party"); *Amnesty Am v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (stating that in deciding a Rule 56 motion, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." (internal citations omitted)).

It is not the Court's responsibility to resolve any purported issues of disputed facts, but merely to "assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986) (internal citations omitted); *accord Cioffi v. Averill Park Cent. Sch. Dist. Bd. Of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (noting that the responsibility of the district court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is

a genuine issue for trial" (quoting *Anderson*, 477 U.S. at 249)). "A genuine issue of fact for trial exists when there is sufficient evidence on which a jury could reasonably find for the plaintiff." *Cioffi*, 444 F.3d at 162 (quoting *Anderson*, 477 U.S. at 252).

## B. NEW YORK LAW GOVERNS PLAINTIFFS' SUCCESSOR LIABILITY CLAIMS

As a threshold matter, the Court must determine whether Pennsylvania or New York law applies to the Plaintiffs' successor liability claims.

In both New York and Pennsylvania, a corporation that acquires another's assets is generally not liable for the torts of its predecessor. *Schumacher v. Richards Shear Co.*, 59 N.Y.2d 239, 244-45, 464 N.Y.S.2d 437, 451 N.E.2d 195 (N.Y. 1983); *Cont'l Ins. Co. v. Schneider, Inc.*, 582 Pa. 591, 873 A.2d 1286, 1291 (2005). However, while Pennsylvania recognizes the product line exception to this rule in certain situations, *see Kradel v. Fox River Tractor Co.*, 308 F.3d 328, 331 (3d Cir. 2002), New York does not. *Semenetz v. Sterling & Walden, Inc.*, 7 N.Y.3d 194, 201, 818 N.Y.S.2d 819, 851 N.E.2d 1170 (N.Y. 2006). As New York law more stringently protects successor corporations, the Moving Defendants, who are all incorporated in Pennsylvania, seek to apply it in the instant matter.

This Court exercises jurisdiction over this matter pursuant to its diversity jurisdiction under 28 U.S. § 1332. A district court sitting in diversity must apply the choice of law rules of the forum state. *Tri-State Employment Servs., Inc. v. Mountbatten Sur. Co.*, 295 F.3d 256, 260 (2d. Cir. 2002) (citing *Klaxon Co. v. Stentor Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941)); *Jackson v. Domtar Indus., Inc.*, 35 F.3d 89, 92 (2d Cir. 1994) (same). *See also Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817, 822, 82 L. Ed. 1188 (1938) ("There is no federal general common law."). Accordingly, in this case, the Court will apply New York choice of law rules. *See Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573,

582 (2d Cir. 2006). An actual conflict occurs when the laws of each jurisdiction differ in a way that has the potential to impact the outcome of the case. *Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 331 (2d Cir. 2005).

Under New York law, courts apply an "interest analysis to determine which of two competing jurisdictions has the greater interest in having its law applied in the litigation." *Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 521, 620 N.Y.S.2d 310, 311, 644 N.E.2d 1001 (N.Y. 1994); *accord GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 384 (2d Cir. 2006). To conduct such an analysis, the Court examines two separate questions: "(1) what are the significant contacts and in what jurisdiction are they located, and (2) whether the purpose of the law is to regulate conduct or allocate loss." *Id.* This will either yield a true conflict of laws, or, as in most choice of law cases, that there is no true conflict. *See Beth Israel Med. Ctr.*, 448 F.3d at 582-83; *Matter of Crichton*, 20 N.Y.2d 124, 135, 281 N.Y.S.2d 811, 288 N.E.2d 799, 806 n.8 (N.Y. 1967).

Under the choice-of-law analysis presented in *Babcock v. Jackson*, 12 N.Y.2d 463, 191 N.E.2d 279 (1963), conduct-regulating rules giving rise to a cause of action, such as the duty and standard of care applicable to manufacturers are commonly supplied by the place where the tort occurred. This is because that state has "the greatest interest in regulating behavior within its borders." *Padula*, 84 N.Y.2d at 519.

In the instant case, the Plaintiffs are residents of New York. The M-Cor implant was sold in New York to Rocco's physician and Rocco's surgery occurred in New York. When the M-Cor implant failed, which occurred in New York, Rocco received medical care in New York. *See, e.g.*, *Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 184 (E.D.N.Y. 2001). The Court finds that New York has the strongest interest in regulating the conduct of manufacturers who sell devices

that will be used by its citizens.  *See O'Connor v. U.S. Fencing Ass'n*, 260 F. Supp. 2d 545, 557 (E.D.N.Y. 2003) (holding that New York has a "significant interest in affording a remedy to its own domiciliaries who are injured as a result of the negligence of another"); *Fargas v. Cincinati Mach., LLC*, 986 F. Supp. 2d 420, 425 (S.D.N.Y. 2013) (stating that New York has a "legitimate interest in protecting its residents from defective products even in cases in which the product was delivered a long time ago").  As a result, the Court will apply New York law.

## C.  SUCCESSOR LIABILITY UNDER NEW YORK LAW

Under New York law, successor liability does not apply in the instant case.  The Court notes that while the Plaintiffs failed to address successor liability under New York law in their briefing papers, the Court nevertheless fully examined the Plaintiffs successor liability claims under New York State law.

As previously mentioned, in New York State, a corporation that purchases the assets of another corporation is not automatically responsible for the seller's liabilities.  *Douglas v. Stamco*, 363 F. App'x 100, 101 (2d Cir. 2010) (internal citations omitted); *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006); *Kessenich v. Raynor*, 120 F. Supp. 2d 242, 255 (E.D.N.Y. 2000); *Schumacher*, 59 N.Y.2d at 243.  However, there are four common-law exceptions whereby liability is assumed: "(1) the successor corporation either expressly or impliedly agrees to assume the predecessor's liabilities; (2) the transaction is a de facto merger; (3) the successor may be considered a mere continuation of the predecessor; or (4) the transaction is fraudulent."  *Kessenich*, 120 F. Supp. 2d at 255; *accord Douglas*, 363 F. App'x at 101-02; *Nat'l Serv. Indus., Inc.*, 460 F.3d at 209; *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 45 (2d Cir. 2003).  None of these exceptions apply to the present facts.

Where, as here, the buyer purchases the assets of a bankrupt entity, it is pertinent to examine the relevant policy considerations involving the bankruptcy laws. The enforcement of a "free and clear" asset purchase agreement furthers the goals of our bankruptcy laws, which encourage sales that maximize the value of the estate, s*ee Douglas*, 363 F. App'x at 102-03. Such agreements have been recognized by the Second Circuit as an integral part of maximizing the value of a bankrupt estate for the benefit of all creditors. *Id*. In recognizing the importance of allowing such free and clear agreements, the Second Circuit noted that "without this assurance of finality, purchasers could demand a large discount for investing in a property that is laden with the risk of endless litigation as to who has rights to estate property." *In re Gucci*, 126 F.3d 380, 387 (2d Cir. 1997) (internal citations omitted); *accord Cargo Partner AG*, 207 F. Supp. 2d at 112.

**1. Implied or Express Assumption of Liability Exception**

Regarding the first exception, the Moving Defendants did not expressly or impliedly assume Portland's tort liabilities as a result of the Agreement, nor have they subsequently assumed such liabilities. The Agreement makes clear that Mipro Ortho Pte., Ltd. expressly rejected all Portland's liabilities, including tort liability prior to the effective date of the Agreement. *See* SOF ¶ 14 ("The [Agreement] further provided that [Mipro Ortho Pte., Ltd.]: shall not assume and shall not be liable for all of the debts, contracts, agreements, commitments, obligations and other Liabilities of any nature whatsoever of [Portland].").  Further, the Moving Defendants were not a party to the Agreement nor any other agreement with Portland. As such, the first exception does not apply to the Moving Defendants.

**2. De Facto Merger Exception**

"A *de facto* merger occurs when a transaction, although not in form a merger, is in substance 'a consolidation or merger of seller and purchaser.'" *Cargo Partner AG*, 352 F.3d at 45

(quoting *Schumacher*, 59 N.Y.2d at 245); *Bowers v. Andrew Weir Shipping Ltd.*, 27 F.3d 800, 806 (2d Cir. 1994) ("A *de facto* merger is no different conceptually from an ordinary merger, except the fact that there has not been 'compliance with the statutory requirements for a merger.'" (quoting *Arnold Graphics Indus. v. Independent Agent Ctr.*, 775 F.2d 38, 42 (2d Cir. 1985)).

There are four factors that are used to determine if a transaction constitutes a *de facto* merger: (1) continuity of ownership; (2) termination of seller's ordinary business and dissolution of selling corporation; (3) buyer's assumption of liabilities; and (4) continuity of management, assets, operations and physical locations. *Cargo Partner AG*, 352 F.3d at 46 (citing *Fitzgerald v. Fahnestock & Co.*, 286 A.D.2d 573, 574, 730 N.Y.S.2d 70, 71 (1st Dep't 2001)); *see Arnold Graphics Indus.*, 775 F.2d at 42 (listing the four factors). The Court is not required to satisfy all four factors to find the existence of a merger. *Diaz v. S. Bend Lathe Inc.*, 707 F. Supp. 97, 100-01 (E.D.N.Y. 1989). *See also* 15 Fletcher Cyclopedia of the Law of Private Corporations § 7165.5 at 339 (perm. ed. 1983) (listing the factors). However, "'continuity of ownership is the essence of a merger,' and the doctrine of *de facto* merger cannot apply in its absence." *Priestley v. Headminder, Inc.*, 647 F.3d 497, 505-06 (2d Cir. 2011) (quoting *Nat'l Serv. Indus., Inc.*, 460 F.3d at 211); *accord Matter of New York City Asbestos Litig.*, 15 A.D.3d 254, 789 N.Y.S.2d 484, 486 (1st Dep't 2005).

Applying these factors to the instant facts, it is clear that the Agreement did not constitute a *de facto* merger. The first inquiry under the *de facto* exception centers on continuity of ownership. "This factor questions whether shareholders of the predecessor become, at the time of the sale of assets, shareholders of the successor corporation." *Diaz*, 707 F. Supp. at 101 (internal citations omitted). The Second Circuit has explicitly held that continuity of ownership is a prerequisite to a finding of *de facto* merger. *Cargo Partner AG*, 352 F. 3d at 46.

The record demonstrates that there was no continuity of ownership between Portland and the Moving Defendants. The Agreement calls for an asset purchase in exchange for cash consideration. An examination of the record yields no evidence that there was ever overlap in ownership of Portland and any of the Moving Defendants.

The second factor under the *de facto* merger exception requires the cessation of ordinary business operations and the dissolution of the selling corporation soon after the transaction. This entails a finding that "there was a corporate reorganization and only one corporation survives the transaction." *Howard v. Clifton Hydraulic Press Co.*, 830 F. Supp. 708, 710 (E.D.N.Y. 1993). Portland continues to exist as a distinct corporate entity and as such, "[where] the predecessor corporation continues to exist after the transaction, in however gossamer a form, the mere continuation [and *de facto*] exception[s are] not applicable." *Desclafani v. Pave-Mark Corp.*, No.07-cv-4639, 2008 WL 3914881, at *5 (S.D.N.Y. Aug. 22, 2008) (quoting *Diaz*, 707 F. Supp. at 100).

Factor three requires the assumption of liabilities by the buyer necessary for the uninterrupted continuation of the business. According to the Agreement, Mipro Ortho Pte., Ltd. did not assume any liabilities of Portland and as such, neither did the Moving Defendants.

The fourth factor requires continuity of management, assets, personnel, business operation and physical locations. An examination of the record reveals no evidence that the Moving Defendants, at any point, assumed any ownership, management, personnel or physical location.

As such, the Court declines to find that the Agreement constituted a *de facto* merger.

### 3. The Mere Continuation Exception

The mere continuation exception applies where "it is not simply the business of the original corporation which continues, but the corporate entity itself." *Ladjevardian v. Laidlaw-Coggeshall,*

*Inc.*, 431 F. Supp. 834, 839 (S.D.N.Y. 1977) (internal citations omitted). "A continuation 'envisions a common identity of directors, stockholders and the existence of only one corporation at the completion of the transfer.'" *Parra v. Prod. Mach. Co.*, 611 F. Supp. 221, 224 (E.D.N.Y. 1985) (quoting *Ladjevardian*, 431 F. Supp. at 839). The Second Circuit has commented that this exception is so similar to the *de facto* merger jurisprudence, they may be considered as a single exception. *Cargo Partner AG*, 352 F.3d at 45 n. 3. Regardless of whether it exists as its own exception, on the record, the Plaintiffs are unable to support such a claim. The Plaintiffs have not procured *any* evidence of overlapping shareholders, managers or directors between the Moving Defendants and Portland. Moreover, "[i]f the predecessor corporation continues to exist after the transaction, in however gossamer a form, the mere continuation exception is not applicable." *Diaz*, 707 F. Supp. at 100. As Portland continues to exist to this day as PLD Corporation Limited, the mere continuation exception is inapplicable to the instant case.

### 4. Fraudulent Transaction

The fourth and final exception is met when a transaction is consummated in order to fraudulently avoid liability. The Plaintiffs have not alleged nor presented any evidence that the Agreement was entered into in order to fraudulently escape obligations. The record demonstrates that Portland entered into bankruptcy prior to the Agreement and that the Agreement was approved by Portland's bankruptcy trustees. As such, the fourth exception does not apply to the circumstances surrounding the Agreement.

Thus, under New York State law, the four common-law exceptions are inapposite to the record present in this case. As such, the Moving Defendants are not liable for the liabilities of Portland.

**D. SUCCESSOR LIABILITY UNDER PENNSYLVANIA LAW**

**1. General Successor Liability**

Even if Pennsylvania successor liability law were to be applied to the present claims, the Plaintiffs' claims still fail as a matter of law.

The State of Pennsylvania also recognizes that "when one corporation sells or transfers its assets to a second corporation, the successor does not become liable for the debts and liabilities of the predecessor." *LaFountain v. Webb Indus. Corp.*, 951 F.2d 544, 546-47 (3d Cir. 1991); *Conway v. White Trucks, A Div. of White Motor Corp.*, 885 F.2d 90, 93 (3d Cir. 1989); *Keselyak v. Reach All, Inc.*, 443 Pa.Super. 71, 660 A.2d 1350, 1353 (Pa. Super. Ct. 1995). There are five common-law exceptions to this rule:

> "(1) the purchaser of assets expressly or impliedly agrees to assume obligations of the transferor; (2) the transaction amounts to a consolidation or *de facto* merger; (3) the purchasing corporation is merely a continuation of the transferor corporation; (4) the transaction is fraudulently entered into to escape liability;" or (5) the transfer was made without adequate consideration and no provisions were made for creditors of the selling corporation.

*Dale v. Webb Corp.*, 252 F. Supp. 2d 186, 189 (E.D. Pa. 2003) (quoting *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 308-09 (3d Cir. 1985)). The first four exceptions have already been discussed in Section II.C. and the Court's analysis of these exceptions under New York law lead to the same result under Pennsylvania law. The fifth exception is inapplicable based on the record of this case.

**2. The Product Line Exception**

The Plaintiffs assert that the Moving Defendants assumed Portland's liabilities pertaining to the M-Cor product line based on a sixth exception, the product line exception, which states: "when a corporation buys substantially all of the assets of a corporate manufacturer and thereafter continues essentially the same manufacturing operation it may be strictly liable for defects in

products in the same line, though they were in fact made by the predecessor." *LaFountain*, 951 F.2d at 547; *Keselyak*, 660 A.2d at 1353.

This exception has never been expressly adopted by the Pennsylvania Supreme Court and recently, that court declined to address its "viability." *See Schmidt v. Boardman Co.*, 608 Pa. 327, 357, 11 A.3d 924, 942 (Pa. 2011). It was first adopted by the Pennsylvania Superior Court in *Dawejko v. Jorgensen Steel Co.*, 290 Pa. Super. 15, 23-26, 434 A.2d 106, 110-11 (Pa. Super. Ct. 1981). The *Dawejko* Court relied on California and New Jersey case law to determine the various factors that were pertinent in determining whether to apply the exception. 434 A.2d at 110-11. Known as the *Ray* factors, there are three main elements to consider in a product line analysis:

> (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.

*Schmidt*, 608 Pa. at 338-39 (quoting *Ray v. Alad Corp.*, 19 Cal.3d 22, 31, 136 Cal. Rptr. 574, 580, 560 P.2d 3, 8-9 (1977)). Although considerable confusion has arisen over the various factors to consider since *Dawejko*, the Pennsylvania Supreme Court clarified that none of the *Ray* factors are mandatory, although it noted that a number of courts have prioritized an examination of the first factor. *See, e.g.*, *Conway*, 885 F.2d at 95-96 (collecting cases).

The Pennsylvania Supreme Court also noted that the exception is equitable in nature, and would it therefore be more appropriate for the product line exception to be applied by a judge. *Schmidt*, 608 Pa. at 363. This Court agrees and finds such an inquiry is a question of law. *See Dawejko*, 434 A.2d at 111. The product line exception applies only to strict liability claims. *See Phila. Elec. Co.*, 762 F.2d at 311.

In the instant case, the Plaintiffs fail to put forth sufficient evidence by which a reasonable jury could find the Moving Defendants liable under the product line exception. The Court concludes that the undisputed facts in the record establish that the first *Ray* factor does not apply here. "[T]he plain language of the first *Ray* factor, as enunciated by the Supreme Court of California in *Ray*, and as adopted by the Superior Court of Pennsylvania … and by the Third Circuit Court of Appeals … warrants the adoption of the causation requirement." *Dale*, 252 F. Supp. 2d at 192.

Portland entered into bankruptcy in December 2008 and entered into receivership a few days later. Soon after, the trustees and receivers for the company held auctions for Portland's assets. Based on the record, it is undisputed that Portland's bankruptcy not only proceeded the asset sale, but triggered it. This is in stark contrast to *Indem. Ins. Co. of N. Am. v. Gross-Given Mafg. Co.*, No. 08-cv-3, 2009 WL 2959825, at *4 (E.D. Pa. Sept. 16, 2009), where the defendant acquired the product line from the predecessor manufacturer prior to that manufacturer's bankruptcy. There, the district court held that the asset sale *caused* the bankruptcy, a conclusion that cannot be drawn from the facts of the instant case. *See, e.g.*, *id.* ("As a result of the asset divestment, [the manufacturer] entered into bankruptcy shortly after the asset purchase. The Asset Purchase Agreement was the contributing force behind the dissolution of [the manufacturer]." (internal citations omitted)).

Further, the evidence contradicts the notion that the Agreement was consummated to remove M-Cor's liability. Rocco's M-Cor implant failed in 2012 and the only other evidence the Plaintiffs presented of additional failures indicates one in November 2011 and another in August 2013. *See* Affidavit of Joseph D'Angelo, ¶¶ 3, 7. The record before the Court does not indicate that either Portland or the Moving Defendants had any knowledge of implant failures at the time

of the Agreement. Therefore, the Court concludes that based on the undisputed facts, the Agreement cannot be said to have caused the destruction of the Plaintiffs' remedies against Portland, the original manufacturer. *Schmidt*, 608 Pa. at 338.

The inability to satisfy the first *Ray* factor has been held to preclude the application of the product line exception by many Third Circuit courts. *See, e.g.*, *Conway*, 855 F.2d at 95. However, even if the Court were to review the various factors holistically, with an emphasis on the first *Ray* factor, as directed by the Pennsylvania Supreme Court in *Schmidt*, the record before the Court still counsels against applying the product line exception.

The third *Ray* factor also tips in favor of the Moving Defendants and weighs against applying the exception primarily because the Agreement explicitly excluded the assumption of Portland's liabilities and the acquisition of Portland's goodwill. Although the Agreement granted the buyer a license to use the Portland name, it could only do so for one year. It further specified that "[t]he Buyer must not represent or hold itself out as acting for or representing Portland."

The Plaintiffs argue that by continuing the same manufacturing operations as Portland, which was required by the FDA, the exception applies. However, the only case cited in support, *Gucciardi v. Bonide Products, Inc.*, 28 F. Supp. 3d 383 (E.D. Pa. 2014), is a district court case where the court denied summary judgment because "a question remains as to what rights and liabilities passed between [the buyer and the seller] in connection with the Product at issue." *Id*. at 398. No such question precludes summary judgment here. The record demonstrates that the Agreement explicitly excluded Portland's goodwill as well as its related liabilities. Fairness counsels against "requiring the successor to assume a responsibility for defective products." *Dawejko*, 434 A.2d at 109. Consequently, even if Pennsylvania state law governed and even

assuming that Pennsylvania adopted the product-line exception, the record reveals that it is inapplicable here.

Finally, the Court finds as a matter of law, that the product line exception cannot apply to Maxx Health and Maxx Ortho. As another district court in this Circuit ruled in a similar case involving the M-Cor implant product line, the product line exception only applies to manufacturers. "Because this doctrine requires that the putative successor manufacture products … the [plaintiffs] cannot show that the defendants are liable under Pennsylvania law." *Edie v. Portland Orthopaedics Ltd.*, No. 14-cv-7350, 2016 WL 1178718, at *3 (S.D.N.Y. Mar. 22, 2016) (collecting cases). As the *Edie* Court noted, although there have been a handful of Pennsylvania federal district courts who have applied the exception to distributors, these cases lack an explanation and tend to predate more recent, apposite examples. *Id.* Further, neither the *Edie* Court nor this Court is aware of any Pennsylvania state case that includes distributors or any other non-manufacturing business in the exception. "The *Dawejko* court adopted a formulation of the product-line doctrine that referred specifically to manufacturers," *id.* at 3, which was affirmed by the Pennsylvania Supreme Court in *Schmidt*. The Court implements such a limitation on the product line exception and declines to extend the product line exception to include Maxx Health and Maxx Ortho, who were never involved in manufacturing M-Cor. As such, even under Pennsylvania state law, Maxx Health and Maxx Ortho are not liable under successor liability theory.

### 3. The Plaintiffs' Rule 56(d) Request

In response to the Defendants' motion for summary judgment, the Plaintiffs allege that Mipro US should be treated as the alter ego of Mipro Ortho Pte., Ltd. in their analysis of successor liability. To that end, the Plaintiffs claim that facts remain to be discovered which they have been

unable to procure. Specifically, the Plaintiffs request that they be permitted to conduct discovery regarding Mipro US financials as well as its corporate officers. It is within the district court's discretion to determine if relief is warranted under Rule 56(d). *Alphonse Hotel Corp. v. Tran*, 828 F.3d 146, 151 (2d Cir. 2016).

The Court denies the Plaintiffs' request as procedurally improper. The Delucas were required to submit an affidavit or declaration showing "that, for specified reasons, [they] cannot present facts essential to justify [their] opposition[.]" FED. R. CIV. P. 56(d). There are four requirements that must be demonstrated by affidavit in order for the Plaintiffs to avoid summary judgment based on Rule 56(d): "(1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 303 (2d Cir. 2003) (quoting *Gurary v. Winehouse*, 190 F.3d 37, 43 (2d Cir. 1999)). The Delucas failed to file an affidavit under Rule 56(d) and instead requested further discovery in their memorandum. "A reference to Rule 56([d]) and to the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56([d]) affidavit … and the failure to file an affidavit under Rule 56([d]) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137 (2d Cir. 1994) (collecting cases).

Even if the Court were to ignore the Plaintiffs procedural error, the request would still be unjustified due to its conclusory nature and the lack of detail required by the Second Circuit. Rule 56(d) does not allow "'fishing expedition[s]' in the hope that [they] could come up with some tenable cause of action." *Waldron v. Cities Serv. Co.*, 361 F.2d 671, 673 (2d Cir. 1966), *aff'd sub*

*nom. First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 88 S. Ct. 1575, 20 L. Ed. 2d 569

(1968). The Plaintiffs also failed to discuss any efforts they undertook to obtain the requested

discovery or why they were unsuccessful in doing so. Each of these failures is fatal to the

Plaintiffs' request.

The Court denies the Plaintiffs' request for additional discovery.

## E. FAILURE TO WARN CLAIM

Finally, the Plaintiffs contend that the Defendants are liable for their failure to warn Rocco

of the potential defects and risks of M-Cor. The parties both assume that New York law applies

here and the Court agrees. *See Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72, 612 N.E.2d 277

(N.Y. 1993). Under New York State law, "[a] manufacturer has a duty to warn against latent

dangers resulting from foreseeable uses of its product of which it knew or should have known."

*Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 237, 700 N.E.2d 303 (N.Y. 1998) (internal citations

omitted). In *Schumacher*, the New York Court of Appeals held that "a successor corporation may

have an independent duty to warn under circumstances similar to those present [as a result of] the

relationship between the defendant 'successor' corporation and the customers of the predecessor

and the actual or potential economic advantage to the defendant successor corporation. Several

factors may be considered in determining whether there exists a sufficient link to create a duty to

warn, among them 'succession to a predecessor's service contracts, coverage of the particular

machine under a service contract, service of that machine by the purchaser corporation, and a

purchaser corporation's knowledge of defects and of the location or owner of that machine.'" 59

N.Y.2d at 246, 248-49 (quoting *Travis v. Harris Corp.*, 565 F.2d 443, 449 (7th Cir. 1977)).

Furthermore, the *Schumacher* court held that an independent duty to warn existed

regardless of whether the purchasing corporation was subject to successor liability under New

York State law. 59 N.Y.2d at 244-46. Typically, the question of whether a successor corporation has an independent duty to warn is reserved for the jury. *See id*. at 248-49.

The Moving Defendants claim that "[t]he application of this doctrine to the issue currently before the Court would be a dramatic increase in the scope of the law." DE 78 at 8. Specifically, they argue that in "virtually all of the reported decisions" involving a successor company found to have a duty to warn, the product at issue is always a machine because a finding of a special relationship between the successor company and the customers of the predecessor is required, typically in the form of a service contract.

However, in *Schumacher*, the New York Court of Appeals held that a duty to warn may exist even without a service contract. 59 N.Y.2d at 248-49. Further, in *Colon v. Multi-Pak Corp.*, 477 F. Supp. 2d 620, 625-28 (S.D.N.Y. 2007), the successor continued to provide service to the plaintiff's employer; there had been additional contact between the two; and there may have been a service contract involved. This was sufficient to raise an issue of material fact and preclude summary judgment. *Id*. at 628. However, in *Goldman v. Packaging Indus., Inc.*, 144 A.D.2d 533, 534 N.Y.S.2d 388, 391-92 (2d Dep't 1988), the Appellate Division ruled that no duty to warn existed when the successor made only one service call to the plaintiff's employer, no service contract was in place and there were no systematic contacts. Finally, in *Sullivan v. Joy Mfg. Co.*, 70 N.Y.2d 806, 517 N.E.2d 1313, 1314 (N.Y. 1987) the New York Court of Appeals ruled that one service call was insufficient to establish the special relationship required by New York law.

In the instant case, Dr. Joseph D'Angelo's affidavit presents evidence that a sales representative purporting to represent Mipro US (1) continues to provide replacement parts for M-Cor products; (2) observed medical procedures during which failed M-Cor products were

removed; (3) asked to take possession of failed M-Cor products; and (4) represented to Dr. D'Angelo that "nothing was wrong."

The Moving Defendants argue that Dr. D'Angelo's affidavit is inadmissible. However, Dr. D'Aneglo's affidavit is, in the Court's opinion, is a sworn statement about events that the affiant witnessed. It is therefore not inadmissible hearsay. *See Scott v. Coughlin*, 344 F.3d 282, 289 (2d Cir. 2003) ("These sworn statements are more than mere conclusory allegations subject to disregard; they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion." (internal citations omitted)). This evidence is sufficient to create a genuine dispute of material fact as to whether, under New York State law, the Moving Defendants had a duty to warn.

The Moving Defendants further argue that they are entitled to summary judgment on the Plaintiffs' duty to warn claim based on the learned intermediary defense. New York law provides that a manufacturer has a duty to warn the physician or relevant medical professional of the risks of a prescription drug or medical device. *See, e.g.*, *Prohaska v. Sofamor, S.N.C.*, 138 F. Supp. 2d 422, 444 (W.D.N.Y. 2011). Put simply, "[i]f the doctor is sufficiently warned, the product is not defective." *Fane v. Zimmer, Inc.*, 927 F.2d 124, 129 (2d Cir. 1991). In support of this claim, the Moving Defendants submit the Instructions for Use that accompanied Portland's hip replacement systems, including the M-Cor. *See* Affidavit of Nach Dave, Exhibit 1. The Instructions for Use include warnings to surgeons to advise patients on "[l]oosening, cracking or fracture of implants" and other related issues. *Id*. This document is submitted along with the affidavit of Nach Dave, a consultant for Mipro US. Mr. Dave asserts that the Instructions for Use "were in effect at the time of Mr. Deluca's hip replacement surgery in January, 2009" and that he understood that they "were

provided to users of [M-Cor] before Mipro US acquired the M-Cor product line in April, 2009." *Id*. ¶ 2.

However, at this point there has yet to be discovery related to this issue. It is unclear if Rocco's physician received the Instruction for Use and whether it is sufficient to warn of the risks present in Rocco's case. To date, discovery has been limited as to two issues: (1) successor liability; and (2) the manufacturing practices of the Defendants in comparison to the manufacturing practices of Portland. *See* DE 44, 49. This limited discovery schedule, ordered by Magistrate Judge A. Kathleen Tomlinson was the result of a request by *the Defendants* to "file early summary judgment motions…or in the alternative… respectfully request that the Court order a period of Fact Discovery which is limited to the issue of whether any of the appearing Defendants are culpable as a liable successor." DE 40.

Without further discovery, summary judgment is premature. Viewing this evidence in the light most favorable to the non-moving party, the Moving Defendants' learned intermediary defense is not ripe for summary judgment and indicates the existence of a genuine issue of material fact. As such, the Moving Defendants' motion for summary judgment is denied with respect to the Plaintiffs' failure to warn claim.

### III. CONCLUSION

For the reasons set forth above, the Moving Defendants' motion for summary judgment pursuant to Rule 56, is granted as to Counts II, III, IV, and V of the Plaintiffs' complaint and is denied with respect to Count I.

It is **SO ORDERED**:

Dated: Central Islip, New York

December 2, 2017

_\_\_/s/ Arthur D. Spatt\_\__

ARTHUR D. SPATT

United States District Judge